IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BARBARA A. COHEN,                    )
                                     )
                Plaintiff,           )
                                     )
v.                                   )        Case No. 02-2246-JPO
                                     )
THE ESTATE OF                        )
TED LOCKWOOD, M.D., DECEASED,        )
                                     )
                Defendant.           )

## MEMORANDUM AND ORDER

I.  Introduction.

This medical malpractice case arises out of certain cosmetic surgery procedures that

were performed in June 2000 on the plaintiff, Barbara A. Cohen, by the defendant, Ted

Lockwood, M.D.[1] Ms. Cohen claims that, during surgery, Dr. Lockwood was negligent in

---

[1] On May 14, 2005, shortly before this case was tried, Dr. Lockwood died as a result of complications of brain cancer. On May 25, 2005, with the consent of defense counsel, plaintiff filed an amended complaint to substitute Dr. Lockwood's estate as the named defendant (doc. 101). Consistent with an oral stipulation recited on the record by the parties' attorneys, the court amended the final pretrial order (doc. 36) to conform to said amended complaint and agreed to start trial on May 31, 2005 even though an estate for Dr. Lockwood had not yet been formally opened. Defense counsel represented, as an officer of the court, that in light of certain professional liability insurance coverage that was in effect, Dr. Lockwood's estate had no risk exposure in this case, and further that counsel for the estate and Dr. Lockwood's widow were aware of the trial and agreed that it should proceed as scheduled. Per this court's request, an estate for Dr. Lockwood was opened on June 14, 2005, and it is the court's understanding that Dr. Lockwood's widow is serving as executrix (*see* doc. 124).

that he somehow compressed, pinched, or otherwise traumatized her left long thoracic nerve.[2]  Ms. Cohen further claims that this negligence resulted in a permanent thoracic neuropathy, which has manifested itself in a condition known as "scapular winging,"[3] and in turn an overall decrease in functionality of her left side.

The parties consented to the trial of this case being presided over by the undersigned magistrate judge (*see* doc. 40).  Later, they waived a trial by jury (*see* doc. 79).  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this memorandum and order will serve as the court's findings of fact and conclusions of law, based on the bench trial which was held May 31, 2005 through June 3, 2005.

II.   Uncontroverted Facts.

Shortly before trial, per the court's request (*see* doc. 80), the parties filed a stipulation concerning many of the material facts of this case, as follows (doc. 106):

---

Given the circumstances described above, during trial, portions of Dr. Lockwood's videotaped deposition were presented by both parties.  Similarly, six other witnesses presented by Ms. Cohen testified by deposition because they reside or work in New York (*see* doc. 125).

[2] As explained in more detail below, Ms. Cohen actually has asserted two alternative claims in this case, i.e., the first for negligence and the second under the doctrine of *res ipsa loquitur.*

[3] Scapular winging describes the situation that occurs when a person extends his or her arms from a resting position, and the scapula (commonly known as the shoulder blade) protrudes noticeably from the person's back.

1.      Ms. Cohen is a hospital laboratory technician at the Downtown Hospital of New York University ("NYU"), in New York City.  She has worked there for more than twenty years.

2.      Ms. Cohen once was morbidly obese but lost more than 150 pounds.

3.      In the process of losing weight, Ms. Cohen became a part-time aerobics instructor.  She started a business called "Firstep," which specializes in classes for overweight women.

4.      Dr. Lockwood was a nationally known plastic surgeon.[4]  Ms. Cohen learned of Dr. Lockwood when he was featured on a national television show.  Ms. Cohen's massive weight loss had left her with excess skin and fatty deposits which could only be removed by surgery.  Dr. Lockwood specialized in a surgery designed to remove these tissues from the lower body.

5.      On June 29, 1999, Ms. Cohen traveled from New York to Overland Park, Kansas (in suburban Kansas City), to see Dr. Lockwood at his medical office.  He completely examined her, and then determined that she was an appropriate candidate for the surgery

---

[4] Interestingly, although not a part of the parties' stipulation, Ms. Cohen's expert witnesses on plastic surgery candidly acknowledged that Dr. Lockwood was not only nationally known, but a highly respected "pioneer" in his field, and that Dr. Lockwood wrote and spoke prolifically in his particular areas of surgical expertise.

known as a "lower body lift."[5]  Dr. Lockwood also took photographs of Ms. Cohen's lower

body at this time.

6.      During the June 1999 visit, Dr. Lockwood also discussed other possible

surgeries to Ms. Cohen's upper body, specifically, an axillary brachioplasty (which generally

involves the removal of excess tissue from the upper arms and armpits), and a mammopexy

(which generally involves a lifting and augmentation of the breasts).[6]

7.      During the June 1999 visit, Dr. Lockwood explained the different types of

procedures and the risks associated with each.

8.      Ms. Cohen came back to Overland Park in December 1999 and, at that time,

Dr. Lockwood performed the lower body lift.  Dr. Lockwood again examined Ms. Cohen

and, on December 7, 1999, took photographs and made notes concerning his performance

of the lower body lift surgery.

9.      Later, after Ms. Cohen had returned to New York, one of the sutures that Dr.

Lockwood had placed during the December 1999 surgery developed an abscess.  Ms. Cohen

_____

[5] Highly summarized, this surgical procedure involves a lifting and tightening of the
thighs, buttocks, abdomen, waist, and hips, at one time.

[6] The final pretrial order (doc. 36), which was filed on July 23, 2003, indicates that
among the three alternative theories of recovery then being asserted, Ms. Cohen claimed that
Dr. Lockwood had failed to follow her preoperative instructions and ultimately used breast
implants larger than she had requested.  But, on the first day of trial, Ms. Cohen abandoned
this claim.  Likewise, although the pretrial order reflects that Dr. Lockwood then was
asserting Ms. Cohen's comparative fault as a defense, that defense was abandoned on the
first day of trial, as it related only to Ms. Cohen's previously described claim concerning the
size of the breast implants.

was treated by a New York plastic surgeon, Gerald D. Ginsberg, M.D.  In consultation with Dr. Lockwood, Dr. Ginsburg saw Ms. Cohen six times during January and February 2000.[7]

10.     Ms. Cohen ultimately decided to go forward with the axillary brachioplasty and mammopexy surgeries, and they were scheduled for June 6, 2000.

11.     On June 5, 2000, Ms. Cohen met with Dr. Lockwood and had another discussion about the risks and benefits of the two procedures he would be performing.

12.     When Ms. Cohen returned to Dr. Lockwood for the scheduled June 6, 2000 brachioplasty and mammopexy, he again examined her and took photographs.

13.     On June 6, 2000, Dr. Lockwood performed the bilateral axillary brachioplasty to tighten the loose skin under Ms. Cohen's arms, and the bilateral implant mammopexy to lift her sagging breasts.

14.     Approximately four months later, on October 2, 2000, Ms. Cohen began physical therapy for problems that she was experiencing with her left shoulder.  The physical therapist wrote at that time that Ms. Cohen complained of pain in her left shoulder, and difficulty raising and lowering her left arm.

15.     The first physician to note scapular winging on Ms. Cohen's left side was Dr. Ginsberg, on October 11, 2000.

---

[7] Despite this abscess and the corrective treatment that had to be rendered by Dr. Ginsberg, it is important to keep in mind that Ms. Cohen makes no claim of medical negligence with regard to Dr. Lockwood's performing the lower body lift surgery in December 1999.  That is, this case only involves claims relating to the surgical procedures that were performed in June 2000.

16.     Ms. Cohen called Dr. Lockwood and arranged an office visit for November 20, 2000.  She traveled to Overland Park and, together with her close friend, Jeffrey Sevitts,[8] saw Dr. Lockwood.  Dr. Lockwood examined her and made an office note.

17.     During the above-described office visit on November 20, 2000, Dr. Lockwood recommended that Ms. Cohen consult with an orthopedic surgeon and obtain an "EMG."[9]

18.     In his notes of the November 20, 2000 meeting, Dr. Lockwood hand wrote: "? scar entrapment of nerves."  Dr. Lockwood also wrote, as indicated in the immediately preceding paragraph, that he told Ms. Cohen she should return to New York for an EMG and an orthopaedic consultation.

19.     On November 27, 2000, as had been suggested by Dr. Lockwood, an EMG on Ms. Cohen was performed by Dong M. Ma, M.D. in New York.  The EMG findings were consistent with left long thoracic neuropathy.

20.     In December 2000, Sheldon R. Simon, M.D., the orthopedic consultant in New York, noted in his records winging of both the left and right scapula.[10]

---

[8] Ms. Cohen and Mr. Sevitts became romantically involved sometime in the early 1990s and they were living together at least during the years 1999 to 2001.  At the time of trial, however, their friendship had become more platonic.

[9]EMG is an abbreviation for electromyography, which is a medical procedure for measuring the electrical impulses of  muscles at rest and during contraction.  Nerve contraction studies, which measure nerve conduction velocity, determine how well individual nerves can transmit electrical signals.  Nerves control the muscles in the body through the use of electrical impulses, and these impulses make the muscles react in specific ways.

[10]However, it should be kept in mind that Ms. Cohen make no claim in this case with regard to any winging of her right scapula.

21.     On March 2, 2001, a second EMG was performed by Dr. Ma.  The EMG findings indicated some improvement compared to the previous examination of November 27, 2000.

22.     On February 6, 2002, Dr. Lockwood's nurse called Ms. Cohen to arrange a telephone conference with Dr. Lockwood for February 11, 2002.

23.     On February 20, 2002, a third EMG was performed by Brion Reichler, M.D., in New York.  Again, the EMG findings showed some improvement compared to the two previous examinations of November 27, 2000 and March 2, 2001.

24.     As of the trial of this case, Ms. Cohen continued to work as a laboratory technician and as a fitness instructor.

25.     During her pretrial deposition in this case, Ms. Cohen testified under oath that she could only lift her arm to a position of "70 to 80 degrees" (i.e., with her arm hanging comfortably downward at her side being regarded as 0 degrees, her arm extended straight out to the side as 90 degrees, and her arm extended straight over her head as 180 degrees), without experiencing pain or scapular winging.

26.     On March 13, 2002, approximately one month after Dr. Reichler performed the third EMG, Dr. Lockwood wrote Ms. Cohen a letter, stating in pertinent part, as follows:

> I have been waiting to see if you have had another EMG recently.  In looking at the EMG of November 2000, and March 2001, initially there were few normal motor action potentials in the left serratus anterior muscle.  However, in March [2001] there were normal motor unit action potentials on volition.  This is consistent with neuropathy, but an improving neuropathy.

-7-

> *This means the nerve was not transected or cut, but was in someway either compressed or pinched, or perhaps traumatized with the surgery.* This should mean that over time improvement of the muscle strength and function should improve (emphasis added).

### III.   Findings of Fact.

As evidenced by the above-described stipulation, there is substantial agreement between the parties concerning many, if not most, of the material facts of this case.  That is, there is no dispute about the fact that Ms. Cohen has scapular winging on her left side.  Nor is there any dispute about the fact that damage to (or at least malfunction of) the long thoracic nerve manifests itself in scapular winging.  And there is little or no controversy about the notion that it would be negligent (i.e., below that degree of skill ordinarily possessed and used by plastic surgeons in similar communities and under like circumstances) to compress, pinch, or otherwise traumatize or damage a patient's long thoracic nerve during the types of plastic surgery procedures that were performed by Dr. Lockwood on Ms. Cohen on June 6, 2000.  What this case really boils down to are two key factual issues.  First, was Ms. Cohen's left long thoracic nerve damaged in some way by Dr. Lockwood during the surgeries performed on June 6, 2000, or was the permanent thoracic neuropathy caused by something else that occurred before, or after, those surgical procedures?   Second, if Ms. Cohen's left long thoracic nerve was damaged in some way by Dr. Lockwood during the June 2000 surgery, then to what extent has Ms. Cohen suffered damages as a result of Dr. Cohen's negligence?

Immediately after trial, at the court's request, the parties filed proposed findings of fact and conclusions of law with regard to the disputed aspects of the case (docs. 114 and 115). Based on the evidence presented during trial, and having had the opportunity to carefully consider and reflect on the credibility of the various witnesses' testimony, and the relative weight of all the evidence that was deemed admissible, the court finds that the material facts (beyond those facts that were stipulated) are as follows:

1.     The long thoracic nerve is a motor nerve, as distinguished from a sensory nerve. When it is properly functioning, the long thoracic nerve sends electrical impulses to the serratus anterior muscle in the chest cavity. *See* Exhibit 43 (colored anatomical reference charts). These electrical impulses help keep that muscle in tone. If the long thoracic nerve is damaged and cannot send the above-described electrical impulses, then the serratus anterior muscle loses tone and functionality. Proper tone and strength of the serratus anterior muscle is essential to the scapula, or shoulder blade, remaining generally in its normal position when a person's arms are extended.

2.     If a person's long thoracic nerve is damaged, the resulting scapular winging generally manifests itself within a matter of a few weeks.

3.     Ms. Cohen's aerobics activities involve dance and the use of light dumb bells which typically weigh three to five pounds.

4.     With regard to the defense contention that Ms. Cohen may have damaged her long thoracic nerve before the June 6, 2000 surgery, the evidence shows that, in February

1999, Ms. Cohen was referred to physical therapy with a diagnosis of left sided neck pain following a bicycle accident.   Ms. Cohen fell on her left side and felt a sudden pain that continued to worsen for two months prior to her referral. *See* Exhibit 416.

5.      On February 24, 1999, Ms. Cohen was examined and found to have limited range of motion, left facet joint restrictions, and secondary muscle spasm.  *Id.*

6.      Between February 24, 1999 and March 2, 1999, Ms. Cohen's physical therapy included joint mobilization, myofascial release,[11] therapeutic stretching and strengthening, electrical stimulation, and hot packs for her neck.  *Id.*

7.      Ms. Cohen did not attend further physical therapy sessions due to work commitments, but was advised to continue her home exercises and see a physician if the symptoms continued.  *Id.*

8.      During the course of Dr. Lockwood's first examination and photography of Ms. Cohen on June 29, 1999, he neither found nor noted any abnormality relating to Ms. Cohen's back, her serratus anterior muscle, or her scapula, whether as a result of the February 1999 bicycle accident or otherwise.  *See* Exhibit 406.

9.      On November 4, 1999, in preparation for the lower body lift surgery which was scheduled for December 1999, Ms. Cohen's primary care physician, Ronald Reape, M.D., examined her, and reported to Dr. Lockwood that she was in "excellent shape."  *See* Exhibit

---

[11]Myofascial release is a specialized stretching technique used by physical therapists to treat patients with a variety of soft tissue problems.

406 (handwritten note by Dr. Reape to Ms. Cohen, and included among Dr. Lockwood's

medical records).

10.     In Ms. Cohen's presurgical blood workup for the lower body lift, which was

done at the New York Blood Center on November 29, 1999 and sent to Dr. Lockwood, she

reported having no history of "neurological problems."  *See* Exhibit 406.

11.     When Ms. Cohen returned to Overland Park in December 1999 for the lower

body lift surgery, Dr. Lockwood again examined her.  On December 7, 1999, he took

photographs and made notes concerning his performance of the lower body lift surgery.  As

was the case in June 1999, Dr. Lockwood's medical records do not contain any note of any

abnormality of or injury to Ms. Cohen's back, her serratus anterior muscle, or her scapula.

12.     As mentioned above, after Ms. Cohen returned to New York following the

lower body lift, one of the sutures placed by Dr. Lockwood during that December 1999

surgery developed into an abscess, and Ms. Cohen was treated by Dr. Ginsberg, the director

of plastic surgery at NYU's Downtown Hospital.  In consultation with Dr. Lockwood, Dr.

Ginsberg saw Ms. Cohen six times during January and February 2000.  In the course of

seeing Ms. Cohen, Dr. Ginsberg, who knew of Dr. Lockwood and was interested in his work,

examined Ms. Cohen thoroughly.  According to Dr. Ginsberg, in February 2000, Ms.

Cohen's back, her scapula, and serratus anterior muscle were normal, and were not injured

as of that point in time.  *See* Exhibit 5.

13.    As earlier indicated, during Ms. Cohen's initial consultation with Dr. Lockwood in June 1999, he explained to her the basic strategy of the axillary brachioplasty and mammopexy procedures along with the risks associated with those procedures, including complications.  On June 5, 2000, Ms. Cohen met with Dr. Lockwood again and had another discussion about the risks and benefits of the two procedures he would be performing. Although no specific claim is made in this case about a failure by Dr. Lockwood to get Ms. Cohen's informed consent, it is uncontroverted that he never mentioned to her that scapular winging was among the risks involved.

14.    In any event, when Ms. Cohen returned to Dr. Lockwood for the June 6, 2000 axillary brachioplasty and mammopexy, he again examined her and took preoperative photographs.  *See* Exhibits 1a, 1b, 1c, 13b-1, and 13b-2.  *See also* Exhibit 406.  During Dr. Lockwood's pretrial deposition in this case on December 11, 2002 (which as earlier indicated was presented during trial), he was asked to examine the June 2000 photographs.  He opined that the photographs showed what might be some "wasting" of muscle tissue on the left side of Ms. Cohen's back.  This is critical because the parties agree that such wasting would be an early  manifestation of thoracic neuropathy.  But having observed Dr. Lockwood's demeanor while testifying, and given his obvious and understandable interest in developing an after-the-fact defensive theory, the court finds that Dr. Lockwood (despite being a highly regarded expert in his field) simply is not credible on this particular point.  That is, on June 6, 2000, at the time of the examination and when the photographs were taken, it is

uncontroverted that Dr. Lockwood failed to note any such wastage or, for that matter, any injuries or abnormalities in Ms. Cohen's back, her scapula, or her serratus anterior muscle. Given Dr. Lockwood's acknowledged expertise in this field, the most reasonable inference that can be drawn here is that, had there actually been any of the above-described problems, Dr. Lockwood would have contemporaneously noted them.  The court finds that Dr. Lockwood did not make note of any problems in this regard because there were none to observe.  The reason is obvious  –  Ms. Cohen did not have any thoracic neuropathy at that time.

15.    Hubert Weinberg, M.D., is a board certified plastic surgeon at Mount Sinai Hospital in New York City.  He testified as an expert witness on behalf of Ms. Cohen. According to Dr. Weinberg, any wasting of the serratus anterior should have been apparent on June 6, 2000, had it been present, and noted in Dr. Lockwood's surgical report.  This testimony went essentially unchallenged by  the defense.

16.    The court finds Dr. Weinberg to be very credible on this crucial point.  He stated that wastage of Ms. Cohen's serratus anterior muscle simply is not evident from the June 2000 photos.

17.    At the time of her admission to Overland Park Regional Medical Center on June 6, 2000, Ms. Cohen is recorded as having denied the presence of any "neurological" or "musculoskeletal" problems, specifically including "back" problems.  Dr. Lockwood's

contemporaneous report of physical examination, in the hospital chart, likewise fails to note findings of any abnormality on "physical examination."  *See* Exhibit 408.

18.     In the course of the surgery on June 6, 2000, Dr. Lockwood actually looked at and manipulated Ms. Cohen's left serratus anterior muscle.  But he failed to notice or record any abnormality, injury, or atrophy of the muscle.  Here again, had any such injury or abnormality been present, it should have been apparent, noticed, and noted by Dr. Lockwood in his written surgical report.

19.     Defendant has failed to offer any credible evidence that Ms. Cohen's left long thoracic nerve suffered from injury before the surgery on June 6, 2000.[12]

20.     The first significant notation in any medical record of any pain or problem concerning Ms. Cohen's left arm or left axilla is found June 7, 2000 (the day following the two surgeries in question), when Dr. Lockwood noted in the hospital chart that Ms. Cohen had "marked pain in left axilla."  It must be acknowledged here, however, that according to Dr. Lockwood (and essentially unchallenged by any of Ms. Cohen's experts), such pain immediately following surgery is not all that unusual given the nature of the brachioplasty.

21.     When Ms. Cohen went home following the June 2000 surgery, her upper body remained immobilized for several weeks, i.e., through the use of medically prescribed restrictive clothing.

---

[12] And, as will be explained in more detail below, the court does not believe that defendant has presented any credible evidence that Ms. Cohen's left long thoracic nerve suffered from injury <u>after</u> the surgery on June 6, 2000.

22.     Within the first several weeks following the period of immobilization, as Ms. Cohen healed, she began to notice a problem developing with her left arm and shoulder. Though her right arm and shoulder were healing normally, she noticed a loss of strength and an inability to move her left arm and shoulder.  She complained of difficulty raising and lowering her left arm.

23.     Mr. Sevitts testified that he noticed the above-described problems while he and Ms. Cohen were still in Overland Park and staying at an extended stay hotel for her to recuperate.  But by his own admission, Mr. Sevitts is "not good with dates."  The court finds that Mr. Sevitts is not a credible witness on this crucial point.

24.     But Ms. Cohen's above-described problems were corroborated during trial by her daughter, Lisa Farrance, who also happens to be a hospital nurse.  From July 13-17, 2000, Ms. Cohen visited Ms. Farrance in the latter's home near Syracuse, New York, following the birth of Ms. Farrance's child.  During this period of time, Ms. Farrance noticed problems with Ms. Cohen's using her left arm, and an apparent "hunch-back" condition.

25.     Despite their familial relationship, and despite her obvious interest in so testifying, the court finds Ms. Farrance to be a reasonably credible witness regarding the onset of Ms. Cohen's scapular winging during the month following the June 6, 2000 surgery.

26.     Ms. Cohen testified that she called Dr. Lockwood twice on the telephone during July 2000 and told him of the problems she was experiencing with her left shoulder.

Ms. Cohen further testified that Dr. Lockwood assured her that these shoulder problems would resolve in due course.

27.     The defense argues that the lack of any notation in Dr. Lockwood's office records (Exhibit 406) reflecting the above-described telephone calls is evidence that Ms. Cohen did not make them.  Although defendant's retained expert witness on plastic surgery, Peter A. Vogt, M.D., testified that Dr. Lockwood was meticulous in his medical charting, the essentially uncontroverted evidence in the trial record shows that, on at least two other occasions, Dr. Lockwood and/or his staff did not make any note of telephone calls that were received with regard to Ms. Cohen's care and treatment.[13]  The court finds that Ms. Cohen did in fact make the above-described telephone calls to Dr. Lockwood in July 2000 complaining about pain and problems with her left shoulder.

28.     Despite the telephone calls Ms. Cohen had made to Dr. Lockwood complaining about her shoulder, and despite the previously described discussions between Ms. Cohen and her daughter, Ms. Cohen did not mention any problems with her left arm or shoulder on July 6, 2000, August 4, 2000, and September 14, 2000, when she went to the office of her primary

---

[13] First, and more importantly, it is clear from the record that Dr. Ginsberg called Dr. Lockwood on January 19, 2000, in the presence of Ms. Cohen, to discuss Dr. Ginsburg's treatment of the abscess complication of the December 1999 surgery.  Second, Ms. Cohen must have called Dr. Lockwood (or at least his staff) to schedule the meeting she had with him in Overland Park on November 20, 2000.  Yet, there is no record of either of these calls in Dr. Lockwood's medical records.

care, family practice physician, Dr. Reape, for a refill of her anxiety medication. *See* Exhibit 417.

29.     Between July 6, 2000 and November 5, 2001, Ms. Cohen was in contact several times with Dr. Reape.  But it was not until much later,  March 13, 2002, that Dr. Reape's office notes show any record of any concern regarding her shoulder neck or back pain. *Id.*

30.     With regard to the defense contention that Ms. Cohen may have damaged her long thoracic nerve after the June 6, 2000 surgeries, the uncontroverted evidence shows that, on September 12, 2000, Ms. Cohen was taken by ambulance to and was seen at NYU's Downtown Hospital emergency room, where she reported falling off her bicycle and onto her backpack. *See* Exhibit 409.

31.     A history and physical examination was performed of Ms. Cohen on September 12, 2000 in the emergency room.  No winging of the scapula was noted, nor was there any report that Ms. Cohen had shoulder pain or difficulty raising or lowering either arm.  In this regard, the defense understandably and fairly persuasively argues that, had there been any damage to the long thoracic nerve during the June 2000 surgery, it would have manifested itself in winging of the left scapula, and it therefore surely would have been noticed during the emergency room examination on September 12, 2000.

32.     In this regard, however, Ms. Cohen and her experts in this case respond by pointing out the nature of the bicycle accident, and specifically, the fact that she had fallen

onto her right side, not the left, and that the resulting abrasions were suffered on her right side. They also point out that Ms. Cohen, at the time of question, was not complaining of any pain on her left side as a result of the bicycle accident. And finally, they argue that, given the typically focused nature of emergency room practice, the scapular winging on Ms. Cohen's left side would not necessarily be observed and noted by the emergency room personnel. Neither party presented any expert testimony during trial from an emergency room specialist. In any event, with more than a modicum of trepidation, the court finds the explanations offered by plaintiff and her expert witnesses reasonable under the circumstances of this particular case.

33.    Just a few weeks later, that is, beginning October 2, 2000, after having conferred with Dr. Lockwood, and at his suggestion, Ms. Cohen began physical therapy for the problems she was experiencing with her left shoulder. The therapist wrote that Ms. Cohen complained of pain in her left shoulder, and "difficulty raising and lowering her left arm." *See* Exhibit 25.

34.    Although as earlier indicated the evidence on this point is somewhat conflicting, the court finds that Ms. Cohen's long thoracic nerve was <u>not</u> damaged as a result of the September 2000 bicycle accident.

35.    After one of the physical therapists had told Ms. Cohen she had winging of her left scapula, she saw Dr. Ginsberg on October 11, 2000. He told her she was suffering from

an injury to the nerve and muscle which held her left scapula in place.  He told her that the left scapula was winging.  *See* Exhibit 5.

36.     In Dr. Lockwood's notes of the in-office meeting he had on November 20, 2000 with Ms. Cohen and Mr. Sevitts, Dr. Lockwood hand wrote, "? scar entrapment of nerves."  By this, he meant that that nerve entrapment  may possibly occur from scar tissue in the axillary tissue.  However, Dr. Lockwood did not tell Ms. Cohen or Mr. Sevitts of this suspicion; as earlier indicated, though, he did tell Ms. Cohen that she should return to New York for an EMG and an orthopaedic consultation.

37.     Ms. Cohen later was seen and treated by several neurologists and surgeons in New York.  It was ultimately concluded Ms. Cohen had suffered an injury to her left long thoracic nerve that could not be repaired, and which in turn had caused atrophy of her left serratus anterior muscle and winging of her left scapula.  Ms. Cohen has been prescribed physical therapy to help her manage the problem and she had continued with such therapy as of the time of trial.

38.     On February 6, 2002, Dr. Lockwood's nurse called Ms. Cohen to arrange a telephone conference with Dr. Lockwood.  Ms. Cohen told the nurse about the injury to her nerve, and the winging of her left scapula.  The telephone conference with Dr. Lockwood was arranged for February 11, 2002.

39.     During the February 11, 2002 telephone conference, Dr. Lockwood told Ms. Cohen that he might have looped the long thoracic nerve with a suture during surgery, or that the nerve might be entrapped by scar tissue.

40.     In his handwritten office notes concerning the February 11, 2002 telephone conference, Dr. Lockwood stated: "I related to her ... that nerve entrapment  may possibly occur from enclosing sutures placed in axillary tissue or from scar tissue ...." *See* Exhibit 406.  Dr. Lockwood's note clearly indicates his belief at that time (three months before this suit was filed) that the surgery may have been the cause of Ms. Cohen's winged scapula.

41.     Viewed in the context of the trial record as a whole, the previously mentioned March 13, 2002 follow-up letter that Dr. Lockwood sent to Ms. Cohen (*see* paragraph 26 of stipulated facts; *see also* Exhibit 4) clearly indicates not just that Dr. Lockwood believed that the June 2000 surgery was a <u>possible</u> cause of the injury to Ms. Cohen's long thoracic nerve (as the defense now suggests), but the <u>probable</u> cause.

42.     Dr. Lockwood candidly acknowledged in his deposition testimony that, <u>if</u> the long thoracic nerve were injured during the surgery that he performed on June 6, 2000, that would be "inconsistent with good medical practice."

43.     Injury to the long thoracic nerve, if caused by the surgery performed by Dr. Lockwood on June 6, 2000, would be below the standard of care for a plastic surgeon performing these kinds of surgeries.

44.     Throughout a detailed discussion of all aspects of the surgery, Dr. Lockwood admits the long thoracic nerve should never be touched, traumatized, or injured during the brachioplasty surgery, or by scar tissue following the surgery.

45.     The parties agree that, during the June 2000 procedures, Dr. Lockwood should not even have been operating in the same tissue plane as the long thoracic nerve.  But here it is very important to bear in mind the extremely close quarters in which this sort of surgery is performed  –  the long thoracic nerve is just approximately one inch away from the tissue planes in which Dr. Lockwood was operating.  Therefore, the court respectfully disagrees with Dr. Vogt (the defense's expert on plastic surgery), who opines that it is "inconceivable" that Dr. Lockwood injured Ms. Cohen's long thoracic nerve during the course of surgery. *See* Exhibit 9, at p. 3.

46.     Even Dr. Lockwood allows, in his office notes of November 20, 2000 and February 11, 2002, that Ms. Cohen's long thoracic nerve may have been injured during the surgery.

47.     Dr. Weinberg testified very persuasively on Ms. Cohen's behalf that the only cause of Ms. Cohen's winged scapula that is reasonably apparent from the records and other available evidence was the June 6, 2000 surgery, and that the injury was probably caused by traumatization of the nerve during the axillary brachioplasty, or by the scar tissue which formed following the surgery.

48.     Dr. Weinberg excludes, credibly so, Ms. Cohen's aerobic exercise and weightlifting as probable causes of the injury.   He also has excluded Ms. Cohen's bicycle accident on September 12, 2000 as the probable cause of the injury, and here again has given credible reasons to support that conclusion (most notably, that Ms. Cohen fell off the bicycle onto her right side, not the left).

49.     Dr. Ginsberg has given opinions that support Dr. Weinberg's opinion.

50.     Along with Dr. Lockwood's above-described testimony, the defense's three retained experts, Eden Wheeler, M.D. (physical medicine and rehabilitation), Dr. Peter A. Vogt (plastic surgery), and Richard B. Rosenbaum, M.D. (neurology), each provided credible testimony of the various "possible" causes of Ms. Cohen's injury.[14]   Like Dr. Lockwood, Drs. Wheeler and Rosenbaum[15] include the June 6, 2000 surgery among the possible causes.  But, notably, in the court's opinion as the trier of fact, none of the three expert witnesses offered by the defense have given the court any credible testimony to assist

---

[14] Because of this, as explained in section IV of this opinion, the court concludes that the doctrine of *res ipsa loquitur* clearly cannot (or at least should not) be applied to this particular medical malpractice case.

[15] According to Dr. Rosenbaum, and according to the medical literature received into evidence in this case without objection (Exhibit 429), long thoracic neuropathy can have many causes and sometimes the cause is undetermined.  Among the known causes are trauma, very strenuous athletic activity (e.g., aggressive and high-level weight-lifting), general anesthesia, and finally, neuralgic amyotrophy (a relatively common disorder characterized by pain and muscle weakness in the upper extremity, with the cause not always able to be determined).

the court in determining which of the various possible causes is the most probable cause of the injury.

51.    As earlier indicated, the court finds that the clear weight of the credible evidence presented during trial is that the injury to Ms. Cohen's long thoracic nerve occurred during the axillary brachioplasty performed by Dr. Lockwood on June 6, 2000, and was not caused by anything that occurred afterward.

52.    Injury to the long thoracic nerve caused by the axillary brachioplasty is evidence of negligent conduct on the part of Dr. Lockwood.  This conclusion is supported not only the medical experts who testified on Ms. Cohen's behalf but also by the admissions of Dr. Lockwood that the nerve should not be injured during the surgery, or by the process of healing following surgery.

53.    Dr. Lockwood was negligent in his performance of the axillary brachioplasty on Ms. Cohen on June 6, 2000.

54.    Ms. Cohen has suffered a significant injury as direct result of Dr. Lockwood's negligence.

55.    The condition of Ms. Cohen's nerve and scapula will not improve to any significant degree.

56.    Ms. Cohen was fifty-seven years old as of the time of trial.  As earlier indicated she has needed, and she probably will continue to need, physical therapy at least twice

weekly for the balance of her expected working years (i.e., through age sixty-five), and perhaps beyond that time, to maximize her ability to work, and also to help care for herself.

57.     As mentioned before, during her deposition in this case, Ms. Cohen testified that she could only lift her arm 70 to 80 degrees without experiencing pain and/or scapular winging.  However, a covert surveillance tape made on November 17, 2004 at the request of the defense plainly shows Ms. Cohen leading a one-hour aerobics class in which she lifts her left arm past 180 degrees, holds her left arm in front of her at 90 degrees while holding a three-pound weight, and holds her left arm behind her head while tying up her hair.  Ms. Cohen appears to move her left arm fairly easily without any significant discomfort.  *See* Exhibit 413.

58.     Ms. Cohen has mitigated her damages.  Notably, as the parties have stipulated, she has continued to work as a laboratory technologist and as an aerobics instructor.  But Ms. Cohen also presented testimony to the effect that she has been advised by her New York physiatrist, Andrew D. Brown, M.D., that in the long term it would be "medically advisable" for her "to seek other employment," i.e., to leave her job as a laboratory technician (due to the constant two-handed functions she must perform),[16] and also to no longer be engaged in the vigorous physical exercise associated with the part-time fitness business.  *See* Exhibit 17. The parties vigorously contested before and during trial whether Dr. Brown actually had

---

[16] However, it should be noted here that Ms. Cohen is right-handed; the winging of the scapula is on her left side.

made a definitive recommendation in this regard. But aside from what Dr. Brown actually said (or how what he said should be interpreted), the fact remains that there is no credible evidence in the record to support the proposition that Ms. Cohen actually will refrain from her current work activities anytime in the reasonably foreseeable future, irrespective of whatever damage award the court might render. That is, it is abundantly clear to the court that, aside from the physical demands on the negative side, and higher income potential on the positive side, Ms. Cohen greatly enjoys her full-time job as a laboratory technologist and her part-time aerobics business. Therefore, the court finds that any award of damages in this case based on lost income, past or future, would be wholly speculative.

59.    Further, it should be noted here that, on February 4, 2003, pursuant to Fed. R. Civ. P. 35, Dr. Wheeler performed an independent medical examination of Ms. Cohen which included a review of Ms. Cohen's past medical records. Dr. Wheeler found that Ms. Cohen's condition had <u>not</u> caused her to be disabled from her job as a laboratory technician or as a fitness instructor. The court finds Dr. Wheeler to be a particularly credible witness.

60.    Ms. Cohen nevertheless has suffered costs of medical care, and physical therapy, to date, related to the injury to her left arm and shoulder, of approximately $25,000. *See* Exhibit 34.

61.     Based on the evidence presented during trial, the court finds that, in the future, Ms. Cohen is likely to incur costs of medical care and physical therapy related to the injury to her left arm and shoulder of approximately $75,000.[17]

62.     The court has not been persuaded that, as a result of Dr. Lockwood's negligence, Ms. Cohen has incurred or will incur expenses for household and personal services.

63.     Nor has the court been persuaded that, as a result of Dr. Lockwood's negligence, Ms. Cohen has incurred or will incur public transportation expenses.

64.     Ms. Cohen's non-economic damages for pain, suffering, disability, and disfigurement, past and future, in the court's view, amount to $200,000.

IV.   Conclusions of Law.

A.     Ms. Cohen's Claim Under the Doctrine of *Res Ipsa Loquitur.*

1.     The doctrine of *res ipsa loquitur* is one of evidence, rather than substantive law.  Generally it becomes applicable in a negligence action where there is no direct proof of negligence, but where circumstances are established so as to leave no conclusion other than that the defendant is at fault.  Because of the favorable presumption

---

[17] Ms. Cohen's contention is that these expenses will be much higher, i.e., as much as $526,000.  *See* doc. 115, at p. 14.  The court, however, viewing this evidence in light of the entire trial record, finds the amount claimed by Ms. Cohen in this regard simply is not credible.  Among other things, the future expenses claimed by Ms. Cohen have not been reduced to a discounted present value, and also fail to take into account several material variables.

of skill and care and the nature of medical practice and treatment, which usually requires expert testimony to establish fault, the problem of determining the applicability of *res ipsa loquitur* in a medical malpractice action is difficult.  Nevertheless, three conditions must be met for the doctrine of *res ipsa loquitur* to apply: (1) the thing or instrumentality causing the injury or damage was within the exclusive control of the defendant; (2) the occurrence must be of such kind or nature as ordinarily does not occur in the absence of someone's negligence; and (3) the occurrence must not have been due to contributory negligence of the plaintiff.  *See Stadtherr v. Elite Logistics, Inc.*, 2002 WL 1067682, at *6 (D. Kan. May 7, 2002).

2.      Because the uncontroverted evidence adduced at trial in the case at bar shows that Ms. Cohen's June 6, 2000 surgery was only one among many potential causes of her injuries, the doctrine of *res ipsa loquitur* clearly does not apply (or at least should not be applied) to this particular medical malpractice case.

B.      Ms. Cohen's Negligence Claim.

3.      The essential elements of a medical malpractice claim in Kansas are: (1) the existence of a duty; (2) breach of that duty; (3) injury; and (4) a causal connection between the duty breached and the injury suffered.  *See Schmidt v. Shearer*, 26 Kan. App. 2d 760, 764, 995 P.2d 381, 386 (1999).  In the case at bar, it is uncontroverted that Dr. Lockwood owed a duty of care to his patient, Ms. Cohen, and it is also uncontroverted that Ms. Cohen has been injured; only the second and fourth elements are in dispute here.  As

reflected by the court's findings of fact, and as explained in more detail below, Ms. Cohen has  proven all of the elements of her negligence claims against Dr. Lockwood.

4.     Under Kansas law, negligence is "never presumed, and may not be inferred merely from a lack of success or an adverse result from treatment." *See Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 756 P.2d 416, 420 (1988).

5.     This is not a case where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience. Therefore, expert testimony is required to establish the accepted standard of care and to prove causation.  *See Latshaw v. Mt. Carmel Hosp.*, 53 F. Supp. 2d 1133, 1138 (D. Kan. 1999) (citing *Bacon v. Mercy Hosp. of Ft. Scott*, 756 P.2d at 420).

6.     On June 6, 2000, when performing the axillary brachioplasty and mammopexy on Ms. Cohen, Dr. Lockwood breached his duty to Ms. Cohen by injuring her left long thoracic nerve.  Such an occurrence was below the established standard of care as testified to by expert witness plastic surgeons, and therefore was negligent.

7.     The negligence of Dr. Lockwood in performing the June 6, 2000 surgeries on Ms. Cohen, specifically, injuring her left long thoracic nerve, was the proximate cause of the deterioration of her serratus anterior muscle and winging of her left scapula, and resulted in the previously described economic and non-economic damages.

V.  Conclusion and Order.

In consideration of the foregoing,

IT IS HEREBY ORDERED that Ms. Cohen's *res ipsa loquitur* claim is dismissed, with prejudice.  However, on Ms. Cohen's negligence claim, judgment shall be entered in her favor and against Dr. Lockwood's estate in the amount of $300,000.00, plus court costs and post-judgment interest as provided by law.

Dated this 11th day of July, 2005, at Kansas City, Kansas.


   s/   James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge